231 P.2d 450

### EDWARDS v. STATE BOARD OF BARBER EXAMINERS et al.

#### No. 5356.

Supreme Court of Arizona.

May 10, 1951.

Udall & Udall, of Tucson, and Thomas E. Allin, Jr., of Benson, for appellant.

Fred O. Wilson, Atty. Gen., Chas. Rogers and Maurice Barth, Assts. Atty. Gen. (Darrell R. Parker, Phoenix, of counsel), for appellees.

FRED C. STRUCKMEYER, Superior Court Judge.

This is an appeal from an order of the Superior Court of Maricopa County dismissing appellant's complaint, wherein he sought a declaratory judgment to adjudge that the price-fixing provisions of the Barber Act, Art. 1, ch. 67, A.C.A.1939, were unconstitutional. As incidental to the main cause of action, plaintiff also asked for an injunction restraining the enforcement of these price-fixing provisions. In his com-

plaint appellant alleged that he has been for many years a barber duly licensed under the laws of the state of Arizona; that by authority of certain acts of the legislature hereinafter referred to, the State Board of Barber Examiners established within the city of Douglas, Arizona, a minimum price for haircuts of one dollar; that the city of Douglas is adjacent to the Republic of Mexico, wherein prices of less than one dollar for haircuts prevail; that many residents of Douglas patronize the barber shops in Mexico by reason of the price differential; and that appellant's business has decreased and his means of livelihood is threatened. Additional allegations were to the effect that not to accede to the price-fixing regulations subjected him to certain penalties including criminal prosecution and loss of license.

Appellant attacked those statutes and portions of statutes dealing with price-fixing as being unconstitutional and void. The principal section of the Act involved is 67–121, A.C.A.1939, providing as follows:

"67–121. *Unfair trade practices.*—(a) The board shall have power to establish minimum prices to be charged for barbering, subject to the conditions hereinafter prescribed.

"(b) Upon receipt of an application and agreement signed by not less than seventy-five (75) per cent of the registered barbers in any district, to establish minimum prices for barbering therein, the board shall set a hearing. Notice of the date and place of such hearing shall be given by the secretary, by registered mail, to every registered barber in such district not less than ten (10) days prior thereto. The board shall, prior to the hearing, investigate the conditions in such district. At the hearing, any barber or other person affected by the proposed agreement may testify or present arguments. After the hearing and investigation, the board may approve or disapprove the agreement as submitted or recommend such changes therein as it may deem proper, including a change of the boundaries of the district, and shall issue an appropriate order. Thereafter, no barber, hair cutter, or apprentice in the district shall charge or collect any price less than that ordered by the board for any barbering work.

"(c) The board, upon its own initiative or upon application of seventy-five (75) per cent of the registered barbers affected, may order a new investigation and hearing regarding the minimum prices theretofore established for any district. Such hearing, and any order issued pursuant thereto, shall be subject to the provisions of this section.

"(d) In establishing minimum prices for any district, the board shall consider only: 1. reasonableness of the proposed prices; 2. local conditions affecting the relation of the barbering profession to public health and safety; 3. minimum prices required to provide sanitary services and appliances necessary to minimize danger to public health, and, 4. costs necessarily incurred

in such district in maintaining a barber shop in a healthful and sanitary condition.

"(e) In this act, unless the context otherwise requires, 'district' means any city, town, or village, or any clearly defined, contiguous portion thereof or territory in addition thereto, in which two (2) or more barber shops are located."

Appellant has submitted six propositions of law in support of the contention of unconstitutionality; the first and, in our opinion, the crucial one being that the fixing of minimum prices for barbering services has no reasonable or substantial relation to public health, safety, or the general welfare, and hence, the acts of the legislature providing for such price-fixing violate Article 2, Section 4, of the Arizona Constitution, and Article 14 of the Constitution of the United States.

Article 2 of the Constitution of the state of Arizona is what is commonly known in state constitutions as a "Declaration of Rights". Section 4 thereof provides, "No person shall be deprived of life, liberty, or property without due process of law." This, of course, is the corollary to that portion of the Fourteenth Amendment to the Constitution of the United States, providing, "* * * nor shall any State deprive any person of life, liberty, or property, without due process of law; * * *."

It should be immediately stated that there can be no question as to the right of the state to invoke the police power to regulate the fixing of minimum wages for personal services under certain conditions. This was finally and conclusively adjudicated in a case upholding the validity of a statute of the state of Washington establishing minimum wages for women. West Coast Hotel Co. v. Parrish, 1937, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703, 108 A.L.R. 1330. However, it does not suggest that the right of a state to impose limitations on the power to contract is unrestricted or that the constitutional safeguards protecting the individual have otherwise been abandoned.

We conceive, therefore, the precise question for determination is: Under what circumstances may a state or its agencies fix minimum wages or prices for personal services? The answer to this requires an examination of the extent of the constitutional exercise of the police power by a state. Of necessity it is incapable of exact definition, as demonstrated by the following statements wherein the attempt is made to demonstrate the concept:

"The police (power) of a State, in a comprehensive sense, embraces its whole system of internal regulation, by which the State seeks not only to preserve the public order and to prevent offenses against the State, but also to establish for the intercourse of citizens with citizens those rules of good manners and good neighborhood which are calculated to prevent a conflict of rights, and to insure to each the uninterrupted enjoyment of his own so far as is reasonably consistent with a like enjoyment of rights

by others." II Cooley's Constitutional Limitations, (8th ed.), 1223.

" * * * The measure of police power must square with the measure of public necessity. * * *" Leonard v. State, 100 Ohio St. 456, 127 N.E. 464, 465.

■ Broad as this power may be, there is at least one limitation which this court has repeatedly recognized and simply stated to be: "A law enacted in the exercise of the police power must, in fact, be a police law." American Federation of Labor v. American S. & D. Co., 67 Ariz. 20, 189 P. 2d 912, 918, affirmed 335 U.S. 538, 69 S.Ct. 258, 93 L.Ed. 222; State v. Borah, 51 Ariz. 318, 76 P.2d 757, 115 A.L.R. 254; State v. Childs, 32 Ariz. 222, 257 P. 366, 54 A.L.R. 736.

Other courts have stated the rationale thereby supplying the limitation. We quote:

"The police power is founded in public necessity, and only public necessity can justify its exercise. The result of its operation is naturally, in most instances, the abridgement of private rights. Private rights are never to be sacrificed to a greater extent than necessary. Therefore, the return for their sacrifice through the exercise of the police power should be the attainment of some public object of sufficient necessity and importance to justly warrant the exertion of the power." Spann v. City of Dallas, 111 Tex. 350, 235 S.W. 513, 515. and,

" 'The fundamental rule, as shown above, is that police regulations must be reasonable. It is generally stated that the means adopted must be suitable to the end in view, must be impartial in operation and not unduly oppressive upon individuals, must have a real and substantial relation to their purpose, and must not interfere with private rights beyond the necessities of the situation. The benefits to society, reasonably to be expected, must not be out of proportion to the restraint imposed and the detriment inflicted on citizens by such restraint. In determining the constitutionality of a statute as measured by the police power, an essential inquiry is whether it is reasonably designed to accomplish a purpose falling within the scope of the police power. * * *' " Myers v. City of Defiance, 67 Ohio App. 159, 36 N.E.2d 162, 167.

In order to sustain legislative interference with the liberties of the individual, there must be an obvious and real connection between the actual provisions of a police regulation and its avowed purpose. This principle is accepted by all the courts. Atchison, T. & S. F. Ry. Co. v. State, 33 Ariz. 440, 265 P. 602, 58 A.L.R. 563.

■■ From the foregoing it is apparent that a statute establishing or authorizing the establishment of minimum prices or wages can only be sustained on the theory that it tends in some reasonable manner to secure the public health, safety, or general welfare. With this principle the appellees are in accord but they urge that: " * * * where an enactment bears any reasonable relationship to the end sought

the courts may not substitute their judgment for the judgment of the legislature." And again stating antithetically: "Hence the rule which is of universal acceptance that the courts will acquiesce in the legislative determination of all matters of fact unless it is clearly erroneous, arbitrary and wholly unwarranted."

With these statements of the law we are in accord. Our difficulty is in finding "any reasonable relationship to the end sought," that is, the relationship between the minimum price for barbering services and sanitation in the barbering profession. Appellees have failed to indicate—to establish any logical relationship whatsoever—the basis for their assumption that the acts in question are not "arbitrary and wholly unwarranted," nor have they pointed out any possible facts which if assumed to be true would place them within the purview of the operation of this rule, nor have we been able to discover any from the reported cases or otherwise conceive of any.

That these statutes cannot be upheld on the basis of "general welfare" has been amply demonstrated. "We may thus fairly conclude that the term 'general welfare' means just what it literally implies, namely, that legislation to be justified and supported by that term must at least promote the welfare of the general public as contrasted with that of a small percentage or insignificant numerical proportion of the citizenry. This conclusion is supported by every case on that subject which we have cited and many others we have read." Ex parte Kazas, 22 Cal.App.2d 161, 70 P.2d 962, 968.

As indicated, we are unable to find any relationship, either in logic or common sense, between the public health and safety and price-fixing in the barbering profession. In this conclusion we are supported by other courts: " * * * The amount of his [barber's] gross or net income is unrelated to sanitation. Cleanliness and antisepsis are inexpensive. Limited amounts of forty percent formaldehyde, two percent carbolic acid solution and soap are the only disinfectants that need be purchased under the Board's present rules. Laundry and the labor of scrubbing seem to be the only other necessary elements of cleanliness. It is within the means of any barber to have a sanitary shop and, it might be suggested, he is not likely to have much business if it is unsanitary. Moreover, under the Act of 1933 the Board has adequate authority to enforce cleanliness in barber shops and to prevent diseased barbers from plying their trade. They are also subject to all reasonable regulations of state and local boards of health. The Act of 1941 therefore was unnecessary to conserve the health of the general public. The declarations in Section 1, with respect to public health and sanitation, seem to us to have no substantial basis in fact and may have been inserted in an effort to lend color of constitutionality to a law that could not otherwise be sustained." State Board of Barber Examiners v. Cloud, 220 Ind. 552, 44 N.E.2d

972, 977. Also see Revne v. Trade Commission, Utah, 192 P.2d 563, 3 A.L.R.2d 169.

In State Board of Barber Examiners v. Cloud, supra, the decided cases on this subject have been collated. Distinctions have been drawn between the various statutes with which we have no concern in this decision. In most instances where statutes have been upheld validating the right to fix minimum prices for barbering services, there have been vigorous dissenting opinions bottomed primarily on the principle we have enunciated here. We are satisfied to rest this opinion on the proposition that individual liberties can be sacrificed only upon a clear showing of a benefit to the public commensurate with the loss of individual rights. "If the Act in question is valid, then the Legislature can directly, or through a board, fix the fees that physicians and dentists may charge for their services; the prices that hotels, restaurants and lunch counters may charge for food; the prices of meats, packing house and canning factory products; and so on ad infinitum until the liberty of the individual and the right to contract is destroyed. As stated by the Supreme Court of the United States in Lochner v. New York, supra [198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937, 3 Ann.Cas. 1133]: " 'It must, of course, be conceded that there is a limit to the valid exercise of the police power by the state. There is no dispute concerning this general proposition. Otherwise the 14th Amendment would have no efficacy and the legislatures of the states would have unbounded power, and it would be enough to say that any piece of legislation was enacted to conserve the morals, the health, or the safety of the people; such legislation would be valid, no matter how absolutely without foundation the claim might be. The claim of the police power would be a mere pretext,—become another and delusive name for the supreme sovereignty of the state to be exercised free from constitutional restraint.' " State v. Greeson, 174 Tenn. 178, 124 S.W.2d 253, 258.

We, therefore, hold that Section 67–121 and all other provisions of the Code relating to price-fixing for barbers are unconstitutional and in violation of Article 2, Section 4, of the state Constitution, and the regulation and order establishing minimum prices for barbering is void. Without regard to the other questions presented we are of the opinion that the orders of the trial court granting the motion to dismiss and dismissing appellant's complaint must be reversed. The judgment is reversed, and the cause remanded, with directions that the order of dismissal be vacated and the motion to dismiss overruled, and that further proceedings be had not in conflict with this opinion.

PHELPS, DE CONCINI and LA-PRADE, JJ., and W. C. TRUMAN, Superior Court Judge, concur.

Chief Justice LEVI S. UDALL and Justice R. C. STANFORD, being disqualified,

the Honorable FRED C. STRUCKMEY-ER, Jr., Judge of Superior Court of Maricopa County, and the Honorable W. C. TRUMAN, Judge of the Superior Court of Pinal County, were called to sit in their stead.